RICHARD S. PAULI AND FELICIA C. PAULI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pauli v. Commissioner
Docket No. 5104-81
United States Tax Court
T.C. Memo 1989-481; 1989 Tax Ct. Memo LEXIS 481; 58 T.C.M. (CCH) 9; T.C.M. (RIA) 89481; September 5, 1989
Alan E. Popkin and Ronald U. Lurie, for the petitioners. Henry T. Schafer and Larry N. Johnson, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: This case was assigned to and heard by Special Trial Judge Daniel J. Dinan pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) of the Code and Rule 180 et seq. [1] For convenience and clarity, the Findings of Fact and Conclusions of Law have been combined in the opinion. The Court agrees with and adopts his opinion, which is set forth below. *482 OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Year
Deficiency
Section 6653(b)
1977
$ 102,332
$  51,166
1978
600,233
300,116
On August 8, 1983, respondent filed an amended answer in which he claimed increased deficiencies and increased additions to tax as follows: Deficiency
Increase in Addition
Year
Increase
To Tax Sec. 6653(b)
1977
$ 194,570.57
$  97,285.27
1978
254,616.54
127,308.77
Respondent's amended answer also asserted, in the alternative, an addition to tax under section 6653(a), should this Court decide that the addition to tax under section 6653(b) is inapplicable. On October 17, 1983, respondent filed a second amended answer in which he proposed to increase petitioners' income for 1977 by $ 38,300. Respondent also asserted a corresponding increase in the addition to tax under section 6653(b), or, in the alternative, under section 6653(a). After trial, joint supplemental stipulations of fact were filed which reflect various concessions made *483 by the parties. The parties agree that income tax deficiencies are due from petitioners for the taxable years 1977 and 1978 in the amounts of $ 74,391 and $ 101,790, respectively. The issues thus remaining for our decision are: (1) whether petitioners are liable for additions to tax under section 6653(b) for fraud; or (2) in the alternative, whether petitioners are liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. Some of the facts have been stipulated and are so found. The stipulations of fact, supplemental stipulations of fact, combined stipulations of fact, supplemental combined stipulations of fact and attached exhibits which were received in evidence are incorporated herein by this reference. Petitioners resided in Anchorage, Alaska, when they filed their petition in this case. They filed joint Federal income tax returns for the years 1977 and 1978. Dr. Pauli practiced full time as a dentist; Mrs. Pauli cared for their children and worked part time as a bookkeeper for the dental practice and other, "business" entities that Dr. Pauli established or caused to have established. Charles H. Bumpus (Bumpus) *484 and Glen A. Huff (Huff) were business associates who lived in Anchorage, Alaska. In 1976, they met one Hiram Conley, a representative of the American Law Association (ALA) who informed them that they could reduce their income and estate tax liability through the use of foreign trust organizations (FTOs). He told them that the use of FTOs to reduce income and estate tax liabilities had been researched by one Karl Dahlstrom (Dahlstrom) and that he conducted seminars on the subject for members of the ALA. Bumpus and Huff joined ALA and attended a seminar given by Dahlstrom in Alaska. At that seminar, Dahlstrom explained the plan to reduce taxes through the use of FTOs. They also received a "tax package" consisting of, inter alia, excerpts from Federal and state tax cases and various tax commentaries. In 1976, Bumpus and Huff created a business trust organization called the American Tax Education Society (ATES) and became its co-trustees. ATES was used by Bumpus and Huff to market "tax package materials" and to provide those who purchased the tax package materials with advice and assistance relating to business trust organizations. Bumpus and Huff, as co-trustees of ATES, *485 established an office and hired Wesley J. Milton, an accountant, to assist purchasers of the ATES tax package with any problems they might encounter after their purchases. In the Spring of 1977, Dr. Pauli, through his professional corporation, Richard S. Pauli, D.D.S., Inc. (the Corporation), paid $ 11,500 to ATES. The payment entitled him to (1) membership in ATEs and in ALA, (2) transportation from Alaska to Houston, Texas, to attend Dahlstrom's tax seminar, (3) transportation from Houston, Texas, to Belize, Central America, (4) assistance from ATES in establishing and maintaining business trust organizations and tax counseling from ATES officials, (5) the ATES tax package and forms pertaining to the establishment of business trusts, and (6) transportation to return to Alaska from Belize. At his seminars in Houston, Texas, Dahlstrom lectured those who attended on how to create foreign and domestic trust organizations in order to reduce their tax liabilities. In April 1977, Dr. Pauli attended a two-day, Dahlstrom Seminar in Houston, Texas. Dr. Pauli was impressed by Dahlstrom's presentation of the ALA/Dahlstrom plan. Dahlstrom informed those attending the seminar that he *486 had been implementing the plan for two years without encountering any problems from the implementation. Dr. Pauli was convinced that Dahlstrom had thoroughly researched the plan and that it was entirely legal. He then journeyed to Belize, Central America, in order to establish his FTOs. Dr. Pauli caused to have created 12 such trusts: Beaver Unlimited, Bentley Trust Company, Bering Trust Company, Caprice Trust Company, Courtly Company, Geneva Limited, Gulf Controllers, Hudson Trust Company, Knik Consultants, Monetary Opinions, Northern Business Services and Pacific Business Services. Belizian law required that the trust "creator" be a resident of Belize. The "creator" of Dr. Pauli's trusts in Belize was one Julian Thompson (Thompson). Under the terms of the various trust documents, Thompson had no rights or responsibilities, except to insure that the terms of the various trusts were carried out by the trustee. On the same day that the aforementioned 12 trusts were created by Thompson in Belize, Dr. Pauli was named, by Thompson, as trustee of the following trusts: Bentley Trust Company, Beaver Unlimited, Bering Trust Company and Gulf Controllers. Again, on the same day, Bentley *487 Trust Company was designated as trustee of: Caprice Trust Company and Courtly Company; Bering Trust Company was designated as trustee of Hudson Trust Company and Monetary Opinions; Beaver Unlimited was designated as trustee of Northern Business Services and Knik Consultants; Gulf Controllers was designated as trustee of Pacific Business Services and Geneva Limited. It is apparent, therefore, that Dr. Pauli, having followed the ALA/Dahlstrom plan, had complete control and dominion over the trusts established in Belize and was authorized in his sole discretion to distribute trust income to anyone, including himself. Upon returning to Anchorage from Belize, Dr. Pauli caused to have created three revocable living trusts: Pauli Trust A, Pauli Trust B and Pauli Trust C. Dr. Pauli considered each of the trusts A, B and C to be "grantor trusts" and that, consequently, any income earned by them would be returnable by him on his Federal income tax returns. Dr. Pauli also caused to have created two "domestic business trust organizations": Lakeside Investments (Lakeside) and LaTouche Dental Services (LaTouche). Again, Dr. Pauli exercised complete dominion and control over these two domestic *488 business trusts. Dr. Pauli transferred to Lakeside unimproved real estate, improved real estate, the assets of the Corporation's profit sharing trust, life insurance policies and cash. In June 1977, Dr. Pauli caused to have all of the operating assets of the Corporation transferred to La Touche. Dr. Pauli then operated his dental practice as a sole proprietorship. LaTouche conducted all of the nonprofessional operations of Dr. Pauli's dental practice. Dr. Pauli then paid LaTouche management fees for the management services it provided to him in his dental practice. Having placed in position the various entities recommended by the ALA/Dahlstrom plan to avoid taxes, Dr. Pauli then implemented the plan. Petitioners have fully conceded the ALA/Dahlstrom "loan-note-gift" plan was to avoid Federal taxes through the use of foreign and domestic "business trusts." The parties have stipulated that petitioners are liable for deficiencies in Federal income tax for the years 1977 and 1978 in the amounts of $ 74,391 and $ 101,790, respectively. Section 6653(b): Fraud. Section 6653(b) provides that if any part of any underpayment of tax required to be shown on a return is *489 due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment was due to fraud. Section 7454(a); Rule 142(b); , cert. denied ; , affd. without published opinion . The Commissioner will carry his burden if he shows that the taxpayer intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. , cert. denied ; , affg. a Memorandum Opinion of this Court; , modified , affd. . The existence of fraud *490 is a question of fact to be resolved upon consideration of the entire record. . Fraud is never presumed, but rather must be established by affirmative evidence. . Circumstantial evidence is permitted where direct evidence of fraud is not available. ; ; ; . Fraud may properly be inferred where an entire course of conduct establishes the necessary intent. ; . The precise amount of underpayment resulting from fraud need not be proved. . The statute requires only a showing that "any part" of an underpayment results from fraud. However, the Commissioner must show fraud resulting in an underpayment for each taxable year in which *491 fraud has been asserted. At trial, respondent examined Dr. Pauli and called two other witnesses, Mr. Egan and Mr. Lawrence. Mr. Egan has been a CPA since 1970. He prepared petitioners' Federal income tax returns for the years 1975 and 1976 and the corporation's returns for the fiscal years ended March 31, 1976 and 1977. After Mr. Egan prepared petitioners 1976, Federal income tax return, Dr. Pauli informed Mr. Egan that he intended to use domestic and foreign trusts in the conduct of his professional services as an orthodonist. Having been informed by Dr. Pauli that he was using foreign business trusts in offering his professional services, Mr. Egan told Dr. Pauli that he and his firm had decided not to involve themselves with FTOs. Mr. Egan further informed Dr. Pauli that neither he nor his CPA firm were knowledgable about the structure or operation of FTOs. Mr. Egan concluded his testimony by stating that he had never advised Dr. Pauli as to the legality or illegality of the ALA/Dahlstrom plan. Mr. Egan, called by respondent as a witness, testified that he did not know whether the ALA/Dahlstrom plan was legal or illegal *492 when he was performing accounting services for petitioners and their professional corporation. Dr. Pauli testified on direct examination by respondent that, in the early spring of 1977, he met with a local Anchorage tax lawyer named William Lawrence. Dr. Pauli testified that he recalled meeting with Mr. Lawrence after work one day and spent about a half-hour with him. Dr. Pauli did not recall the specifics of his conversation with Mr. Lawrence but thought that he discussed the ALA/Dahlstrom plan with him. Dr. Pauli recalled that Mr. Lawrence had informed him that the ALA/Dahlstrom plan was interesting but that Dr. Pauli would be "chancing it." Respondent called Mr. Lawrence as an impeachment witness. Mr. Lawrence testified that Dr. Pauli was never a client of his and that he did not recall ever giving Dr. Pauli any legal advice about anything. In this case, respondent has failed to prove by clear and convincing evidence that some part of the underpayment for each year was due to fraud. Respondent has failed to show that petitioners intended to evade taxes through conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes. ; *493 ; Beaver v. Commissioner, supra at 9293; . Petitioners were clearly misled when they involved themselves in the use of the complicated ALA/Dahlstrom business trust program. Dr. Pauli was educated to be a dentist. There is nothing in the record to indicate that Dr. Pauli was knowledgeable in tax matters and we conclude, as noted above, that he was misled into believing that the Dahlstrom Plans were acceptable. The use of foreign and domestic business trusts seemed to petitioners to be a legitimate method of reducing taxes. When petitioners began using the foreign business trusts to reduce their tax liability, the trusts seemed to be similar to corporations -- legal fictions with substantial tax benefits. Petitioners did not distinguish the theoretical tax law differences between the legitimacy of the use of the corporation to reduce taxes and the illegitimacy of the use of foreign business trusts to accomplish the same purpose. In both instances, petitioners signed legal documents and kept meticulous records detailing transactions between Dr. Pauli, *494 his Corporation and his business trust organizations. Respondent's evidence at trial to sustain his burden of proving fraud by petitioners was threefold: (1) petitioners participated in the ALA/Dahlstrom plan to avoid taxes, (2) petitioners failed to produce records to the IRS during the audit of their returns, and (3) petitioners had unreported income during the years in issue and claimed deductions to which they were not entitled. Our reading of this record causes us to conclude that respondent's principal argument is that participation in the ALA/Dahlstrom plan to avoid taxes through the use of domestic and foreign trust organizations was, per se, evidence of fraud. We disagree. See . While Dr. Pauli's communications with respondent appear to us to have been adventuresome, we do not find it to be the type of conduct usually associated with the fraudulent concealment of records in order to evade tax. Finally, respondent points to various omissions of income and excess deductions attributable to petitioners as evidence of fraud. We have reviewed the record and have determined that most *495 of the alleged omissions from income and excess deductions result from adjustments made to petitioners' returns and the returns of their numerous trusts. We also note that in the stipulations of fact filed at the trial of this case, respondent agreed to allow petitioners unclaimed deductions on their 1977 and 1978 returns in the amounts of $ 44,799.71 and $ 20,545.81, respectively. Again, these adjustments resulted from other adjustments made to petitioners' "business trusts." No clear and convincing evidence of fraudulent intent by petitioners exists. Upon a review of the record in this case, we conclude that the underpayments of tax for the years in issue resulted from petitioners' mistaken belief as to the legal consequences of the various transactions involved. Accordingly, respondent has failed to prove fraud and we hold for petitioners on this issue. Negligence. Respondent pleaded alternatively in his amended answer and asserted the addition to tax for negligence under section 6653(a). As this issue was not raised in the notice of deficiency, it constitutes new matter upon which respondent bears the burden of proof. Rule 142(a). However, unlike the issue of *496 fraud where respondent's burden of proof must be carried by clear and convincing evidence, respondent's burden of proof on this addition to tax for negligence may be met by a preponderance of the evidence. Rule 142(a). Thus, respondent must introduce sufficient evidence to make a prima facie showing that petitioners' failure to pay their tax liability was due to negligence or intentional disregard of rules and regulations. . As we noted, supra, Dr. Pauli testified on direct examination by respondent that, in the early Spring of 1977, he recalled a meeting with a local Anchorage tax attorney named William Lawrence. Dr. Pauli recalled that Mr. Lawrence had informed him that the ALA/Dahlstrom Plan was interesting but that Dr. Pauli would be "chancing it." We believe that a reasonable and prudent man, having been informed by a tax attorney that he would be "chancing it" if he embarked upon a particular tax program, would have further consulted with knowledgeable tax attorneys about the validity or legality of the program. Dr. Pauli did not do so. Respondent has demonstrated to this Court that petitioners' deficiencies *497 in tax for the years 1977 and 1978 were due to negligence and we so find. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩